In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-24-00440-CR
NO. 09-24-00441-CR
NO. 09-24-00442-CR

_____

**RAUL ALVAREZ PRADO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

_____

**On Appeal from the Criminal District Court**
**Jefferson County, Texas**
**Trial Cause Nos. F21-38021, F21-38022, F21-38023**

_____

**MEMORANDUM OPINION**

A jury convicted Raul Alvarez Prado of Sexual Assault of a Child, and two

counts of Indecency with a Child by Sexual Contact, all second-degree felonies. Tex

Penal Code Ann. §§ 22.011(a)(2), (f); 21.11(a), (d). The jury assessed Prado's

punishment at twenty years of incarceration in the Texas Department of Criminal

Justice on each count. The trial court sentenced Prado accordingly and ordered each sentence to be served consecutively.

In a single issue, Prado challenges the sufficiency of the evidence to support his convictions. We affirm as modified.

## Background

**Larry**

Larry testified that he is Prado's son and older brother to Ruth, the victim in this case.[1] Larry and Ruth lived in Mexico with his maternal grandparents until he was six years old. At that time, he and Ruth were sent to the United States to live with their parents, Mother and Prado. According to Larry, he and his sister did not have a relationship with their parents prior to their arrival in the United States. Larry, Ruth and their parents lived in China, Texas for about six or seven years before moving to Nome, Texas. Larry has four younger siblings, Ruth, Lonnie, Jill, and Rita. Larry testified that Jill and Rita are much younger than his other siblings. When the family moved to Nome, Mother and Prado slept in one room, the boys in another

---

[1]We refer to the victim and her family members by pseudonyms. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

2

room and the girls in another. In the girl's room, two beds were shared between three girls.

Larry described the family dynamics, stating that when he and Ruth lived with their grandparents in Mexico, his grandparents cared for them, fed them, and made sure they went to school. With his parents, he never felt a complete part of the family.

> You know, you wish you had that love and affection from your mom and dad, like, hey, you know, pretty much take us under their wing, you know, I mean, as a parent and learn how to, you know, like putting in school, which we did go to school and all. But the love and affection was not there; and that's something that we kind of, like, cried for, you know.

Mother cleaned houses and Prado worked on a ranch in China, Texas, until he had hernia surgery and was no longer able to work. After that, Prado was at home all the time, and Larry began to support the family financially at age fifteen. Larry testified that his father "mistreated" his children and that he would "hit us, me and my sister and my two siblings at the time." This abuse started when they first arrived from Mexico. Larry believed that Mother was afraid of Prado and would not intervene to stop the abuse. According to Larry, he and Ruth received the worst abuse because they did not have parental "affection[,]" and Prado used to hit the children with "cables and stuff" to the point that the children could not attend school some days. The abuse continued until adulthood when Larry got married. He testified the whole household lived in fear of Prado. Prado would threaten the

3

children that if they spoke up, they would be deported. According to Larry, Prado attempted to sexually assault him when he was about eight or nine years old.

When Ruth was about sixteen years old, Larry noticed a difference in the way Prado treated her. According to Larry, Prado would take Ruth out to teach her how to drive in the evenings. Prado and Ruth would stay out all night and sometimes come home around "5:00, 6:00 in the morning[.]" Other times, Prado would ask Ruth to come in the bedroom and "'[m]assage his leg,' or something because he had cramps." Larry testified that Prado would ask all the children to do this, but "[h]er more often than any of us." Larry and Ruth worked together at a pharmacy until their schedules differed, and Larry drove when they went to work together because Ruth did not know how to drive. Prado was very protective of Ruth, showing up to her work before her shift was over and waiting on her. At that time, Larry noticed changes in the relationship between Prado and Mother; they were not as affectionate and were more like roommates, sleeping in different beds. When Prado returned from "drives" with Ruth, Mother appeared "jealous." When Ruth told him about the sexual abuse, he had "flashbacks" to their childhood and recalled strange things between Ruth and Prado, in which Prado treated Ruth like his wife. Eventually, with help from a family friend, Larry facilitated his family's leaving Prado, but eventually, Mother and Lonnie returned to live with Prado.

4

During cross-examination, Larry admitted he never heard any noises from the bedroom when Prado was in there with Ruth, but he testified that he observed Prado inappropriately touch her, although he later testified, he saw nothing.

**Rita**

Rita is Larry and Ruth's younger sister. Rita testified Prado was a "bad father. He was mean." She detailed several instances of physical abuse directed at her and her siblings, including Ruth. She testified about one instance when Prado told her that he wanted to kill her sister Jill, chop up her body, and feed her to her siblings. Rita was not allowed to have a life outside of school and home. After Ruth told Larry about the sexual abuse, Rita was instructed by her siblings to leave her parents' home. She testified that after she found out about the sexual abuse, things she had observed in the past "clicked[.]" She recalled her father bringing Ruth alone into his bedroom at night, where she would stay for almost an hour. She felt that Prado was always nicer to Ruth in some ways. For example, she stated that if she or her other siblings did not clean the bathroom correctly, Prado would beat them, but with Ruth he "laughed it off[.]" She recalled other times when Prado took Ruth out to "the back roads" at night to teach her how to drive, and they always came home intoxicated. Ruth also had several unexplained physical ailments including pains in her stomach.

She described Ruth as frail and thin, and she thought Ruth may have had an eating disorder.

**Jill**

Jill is Prado's daughter and Ruth's younger sister. Jill testified regarding her childhood and various homes that the family lived in while she was growing up. Jill testified she did not have "much of a relationship" with her father, and that it was built off "fear [and] anger." Prado told his children he would rather that they be scared of him than to love him. She described her father's abuse starting when she was in preschool. She testified Prado would beat Ruth if she wore makeup. She recalled occasions when Prado made sexual advances toward her or her sister during which he touched their breasts:

> The kitchen was most of the place because that's where he spent most of his time at. Okay. So, he would call us over, like, "Hey, come here; I want to talk to you," and stuff. And then he would be sitting in this chair, you know, the main chair. This is the kitchen table, whatever.
>
> […]
>
> And then he would call us. And then he'll grab us like this (indicating), and then he would have his hand under you like this (indicating). But I would try to, like, hold my hands, my fists really close to me, so he won't go, like, down. So, he wouldn't go up, you know. But there was times he obviously, like, went up. But we learned if we kept our hands, like, really close to ourselves, that he can't manage to go up. But he would try to, like, move you, like, come on, like, you know, move you. Or he would try to act like he was getting milk from us, like, he would

6

be like, "Just give me milk" and he'll make like these noises, like he was reaching like that -- this is me right here --

Jill explained that when Prado's hands would "come up" he would actually touch her breasts. She recalled Ruth's appearing "sick" but doctors could not find anything wrong with her. Although she was young, she remembered thinking it was "weird" when Ruth would go into Prado's bedroom at night. Whenever Jill would enter the room, she would always see Prado and Ruth lying on the bed under the covers or Ruth behind Prado giving him a massage. Jill left the household when she was twenty years old, after finding out that Prado sexually abused Ruth.

**Anna Maria Lagos Escobar**

Anna Maria Lagos Escobar is a pharmacist who previously worked with Ruth at Walgreens. Escobar and Ruth developed a friendship, and Ruth began to confide in her. She testified Ruth and her family were "terrified" of Prado. She recalled how Prado and Mother would wait on Ruth every day for an hour before her shift ended at the pharmacy. She stated that as she and Ruth became closer, Ruth told her about physical abuse at home. She described Ruth as "tiny and skinny" and that she looked like a fourteen-year-old, not a twenty-six-year-old. One day, Larry and Ruth approached Escobar and asked her to give Prado a letter when he arrived later that day at the pharmacy to pick up Ruth. Ruth told Escobar that she planned to leave through the back of the pharmacy because "[Prado's] really going to hurt me if he

7

knows that I talked." Mother arrived at the pharmacy first, and when Ruth and Larry told Mother, she responded, "Are you sure that this is true?" According to Escobar, Mother left with Ruth and Larry but went back to Prado that night. When Escobar gave the letter to Prado, he read it and stated, "You know that this is not true, right[?]" According to Escobar, Prado displayed "zero emotion" and drove away. Escobar testified Ruth is different since leaving Prado's house; she is doing better, but her anxiety has returned due to the legal proceedings.

**Julie Prudhomme**

Julie Prudhomme is the Clinical Director of the Garth House. Prudhomme described her educational and professional background and stated that she is a licensed professional counselor who works with child victims and their family members. Prudhomme did not counsel the children in this case but reviewed their statements and the offense reports. She described the concept of grooming and how it can lead to long-term negative effects into adulthood. She also discussed delayed outcries and explained how sexual assault, especially by a family member, can be confusing. She testified that based on her review, Ruth was stuck in a place where she could not get out.

**Brenda Garison**

Brenda Garison is the Director of Child Abuse and Forensic Services and is a Sexual Assault Nurse Examiner (SANE nurse). She detailed her educational and professional background and explained the procedures for conducting a SANE examination, such as the one she conducted on Ruth in June 2021. A copy of her report was admitted into evidence. Garison recorded the following narrative from Ruth about the sexual abuse and read it to the jury:

> It started when I was 16 years old, my dad, [Prado] has been having sex with me. I was too scared to tell anyone, I thought I was protecting my family. My dad would tell me he loved me, not like a daughter but something more. He told me I was better than my mom. I know I shouldn't have but when it started I had written him a letter and he showed it to my mom and she thinks I'm the one to blame but I was just confused. He never let us go out. When it first started, I did tell a friend and the police came out but I was too scared to talk. [We] lived in a trailer in Hardin County when it started, that's where the police came to. He would get me to massage his legs and stuff. The first night he called me into the bedroom and after I massaged his legs he put my hand on his penis and ask [sic] me to touch it. He told me not to tell my mom. After that he started touching on me. Later, he started having sex with me in the afternoons when he was teaching me to drive. We would go on a back road and he would "do" it. I didn't want to tell him no, I didn't know what he might do. He told me if I wanted him to stop, he would but I was afraid he might do it to my younger sister. He told me, 'you have something your mom doesn't have'. He used to ask me if I had ever had sex with anyone else because I didn't bleed when he had sex with me. The only time he used a condom was when I worked at a service station and I could get them there. When I stopped working there, he stopped using them. He would pull out unless he was super drunk to keep from getting me pregnant. He would do it on my body or on the ground; it just depended on what setting we were in. He would

9

always try to keep up with my periods. At first, he would do it in my anus but that hurt too bad so he stopped. He would put it in my mouth also.

Garison performed an examination on Ruth but did not observe any signs of acute or non-acute trauma. Garison did not observe any signs of trauma during her examination, but she testified none were expected given Ruth's history.

**Ruth**

Ruth testified she moved to her parents' home when she around five years old. She has two brothers and two sisters, and she is the "second oldest" child. She recalled that her father was "so strict, always hard-handed[,]…like we wouldn't do anything that's wrong, but to him it was wrong. He would get mad, yell at us, call us names." Prado's abuse escalated to physical abuse when she was about eight years old. Ruth testified Prado would "find anything on his way…to use to hit us[,]" including cords, hangers, belts, or his hand. Ruth was afraid of Prado, but to outsiders, they appeared to be a normal family.

When Ruth was around fifteen years old, Prado's abuse changed. Prado would ask Ruth to give him a massage while in his underwear in his bed. At first, he would be face down and ask Ruth to rub his thighs and legs, that changed one night, when he was drunk, he turned over and placed her hand on his penis and asked her to stroke him. Another time, he climbed into the bed Ruth shared with her sisters and

touched her inside her underwear including penetrating her vagina with his finger. He stopped when her mother came into the room, lifted the covers and told him to leave.

When Ruth turned seventeen, Prado offered to teach her how to drive. Prado took Ruth to an isolated road, had her lie down in the seat, removed her clothes, and had intercourse with her. Ruth recalled that she told no one because she was scared. Ruth did tell her best friend in school, which prompted law enforcement to visit her home. Ruth lied and told the officers that nothing had happened. After the sexual assault in the vehicle, the assaults became more frequent, usually on Friday nights. According to Ruth, later when the family moved to a new house, the sexual assaults became "more regular[]." During this time, Prado would call Ruth into his bedroom and abuse her while her mother was cooking, and her siblings were in other rooms. Ruth would give Prado a "hand job[,]" perform oral sex on him, or they would have intercourse. This abuse happened several times a week. Prado told Ruth, "I don't see you as my daughter. I see you as my wife or a person, you know, my girlfriend[.]" This sexual relationship continued until she moved out of her parents' home when she was twenty-six years old.

The jury found Prado guilty on each charge and sentenced him to twenty years' incarceration in the Texas Department Criminal Justice on each count. The

trial court sentenced Prado accordingly and ordered each sentence to be served consecutively. Prado timely appealed.

## Sufficiency of the Evidence

In a single issue, Prado challenges the sufficiency of the evidence to support his conviction. Prado argues that "the evidence raised mere allegations and suspicions of guilt rather than meeting the constitutionally required proof beyond a reasonable doubt[,]" and that the "quality" of the witnesses testimony, who had great hatred for Prado, "added little to support the quality of the evidence from witnesses who were to relate what they observed."

## Standard of Review

The jury is the exclusive judge of the credibility of the evidence and the weight to be given to that evidence. *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). As such, the jury is responsible for resolving conflicts in the testimony, is free to believe some, all or none of a witness's testimony, and may assign as much or as little weight to a witness's testimony as it sees fit. *Id*. Jurors may also draw reasonable inferences from the evidence. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) "[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *Id*. at 16.

When examining whether a criminal conviction is supported by legally sufficient evidence, we compare the evidence to the elements of the offense as

12

defined by a hypothetically correct charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). We consider all the evidence, viewed in the light most favorable to the verdict, along with the inferences that could reasonably be drawn from the evidence. *Hooper*, 214 S.W.3d at 13. "Direct and circumstantial evidence are treated equally: 'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.'" *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting *Hooper*, 214 S.W.3d at 13). We do not assess the credibility of the evidence, reweigh the evidence, nor substitute our judgment for that of the jury. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (citation omitted).

The evidence is legally sufficient to support the conviction if any rational trier of fact could have found each of the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). "Each fact need not point directly and independently to a defendant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (citation omitted); *see also Garcia v. State*, 667 S.W.3d 756, 761–62 (Tex. Crim. App. 2023) (citation omitted) ("A proper review of evidentiary sufficiency considers the cumulative force of the evidence.").

Texas Penal Code section 22.011 provides that a person commits sexual assault of a child, a second-degree felony, if he intentionally or knowingly causes the penetration of the sexual organ of a child by any means. *See* Tex. Penal Code Ann. § 22.011(a)(2)(A), (f). Texas Penal Code section 21.11 provides that a person commits indecency with a child, also a second-degree felony, if that person, with a child younger than seventeen years old, whether the child is of the same or opposite sex and regardless of whether the person knows the age of the child at the time of the offense, engages in sexual contact with the child or causes the child to engage in sexual contact. *See id*. § 22.11(a)(1), (d). Sexual contact under section 21.11 includes any touching by that person, including touching through clothing, of the anus, breast, or any part of the genitals of a child; or any touching of any part of the body of a child, including touching through clothing, with the anus, breast, or any part of the genitals of a person. *Id*. at 21.11(c).

The testimony of a child victim, standing alone and without corroboration, is sufficient to support a conviction for sexual assault of a child. *See* Tex. Code Crim. Proc. Ann. art. 38.07 (providing that a child's testimony alone is sufficient to support a conviction for sexual assault when either the victim informed someone other than the defendant within one year after the offense allegedly occurred or when the child

14

is under the age of seventeen at the time of the alleged offense); *Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. 1978).

Here, the jury had the benefit of the victim's testimony and several other witnesses' testimonies. The victim, Ruth, testified that she was seventeen or younger during the assaults and that her father put his finger in her sexual organ, and engaged in sexual contact with her by having her touch his genitals or by having his genitals touch her genitals. The SANE nurse provided similar testimony. Ruth testified the sexual assaults occurred while she was taking driving lessons with her father, or when they were alone in her father's bedroom. Ruth's testimony was sufficient, and her siblings corroborated her testimony by confirming the circumstances during which she was alone with Prado. Viewing the evidence in the light most favorable to the verdict and deferring to the jury the responsibility of determining the weight and credibility of the evidence, we conclude that a reasonable factfinder could have found Prado guilty of sexual assault of child and two counts of indecency with a child beyond a reasonable doubt. *See* Tex. Penal Code Ann. §§ 22.011(a)(2)(A); 21.11(a)(1); *see also* Tex. Code Crim. Proc. Ann. art. 38.07(a), (b)(1); *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13. We overrule Prado's sole issue.

## Judgments

While not raised by either party, we note that the judgments do not reflect a correct assessment of the trial court's oral pronouncement on punishment.

When a defendant has two or more convictions, the trial court may order that the sentences run concurrently or consecutively.[2] *See* Tex. Code Crim. Proc. Ann. art. 42.08(a). Recommended elements for a valid cumulation order include: (1) the cause number of the prior conviction; (2) the correct name of the trial court where the prior conviction was imposed; (3) the date of the prior conviction; (4) the term of years of the sentence imposed for the prior conviction; and (5) the nature of the prior conviction. *Stokes v. State*, 688 S.W.2d 539, 540 (Tex. Crim. App. 1985). The trial court need not include all five elements in its cumulation order. *Id.*

At the conclusion of the punishment phase of trial, the trial court stated:

> Your sentences have been assessed at 20 years confinement and a fine of $10,000 in each case. You have committed numerous acts of incest and criminality for ten years, as shown in this trial. It would not be just if these sentences were running concurrently. The message that would

[2]Generally, section 3.03 of the Texas Penal Code requires concurrent sentences if the State prosecutes the defendant for conduct that arises out of the same criminal episode when the defendant is prosecuted in a single criminal action. Tex. Penal Code Ann. § 3.03(a). However, Penal Code section 3.03(b) includes several exceptions to the general rule requiring concurrent sentencing, and the exception pertinent to Prado's case addresses defendants who are convicted of sexually assaulting victims who were younger than 17 when the assault occurred. *Id.* § 3.03(b)(2).

16

be sent would be if you're going to abuse a child, abuse as much as you can because you'll only be punished as though it was one event.

This was over a term of ten years. These sentences shall run consecutively with each other, which means you will serve ten years on -- I presume it will be up to the authorities -- but ten years first in the earlier Cause No. 21-38021, the sexual assault of a child. When that term of service of 20 -- I said 10 years -- 20 years confinement, as assessed by the jury -- when that 20 years confinement is completed, you will serve the confinement of 20 years as punishment in Cause No. 21-38022, the indecency with a child. And when that is completed, you will begin and serve the third 20-year sentence of 21-38023 of a second second-degree felony of indecency with a child.

You should not be able to sexually abuse a child, your own child, over a decade of time ruling a family and then package these three convictions and sentences as though it was one event. Each crime -- each time you harm a child should, in all fairness, subject you to a separate event of punishment and be accountable for each separate harm that you applied and committed over this child. So, the sentences shall run consecutively to each other.

The trial court's judgments state the following in each cause number:

Cause Number F21-38021:

THIS SENTENCE SHALL RUN: CONSECUTIVE (WITH 21-38022 AND 21-38023)

Cause Number F21-38022:

THIS SENTENCE SHALL RUN: CONSECUTIVE

Cause Number F21-38023:

THIS SENTENCE SHALL RUN: CONSECUTIVE

"When the oral pronouncement of sentence and the written judgment vary, the oral pronouncement controls." *Ex parte Madding*, 70 S.W.3d 131, 135 (Tex. Crim. App. 2002). "A valid cumulation order should be sufficiently specific to allow the Texas Department of Criminal Justice -- Institutional Division (TDCJ -- ID), to identify the prior with which the newer conviction is cumulated." *Ex parte San Migel*, 973 S.W.2d 310, 311 (Tex. Crim. App. 1998) (citation omitted). A cumulation order that refers only to a cause number is sufficient if the sentencing order is from the same court. *See id*.; *Hamm v. State*, 513 S.W.2d 85, 86 (Tex. Crim. App. 1974) (citations omitted).

Here, although the sentences are from the same court, the judgments cumulating the sentences did not include the cause numbers. The record, however, contains ample information for this Court to reform the trial court's cumulation order. An appellate court may modify a cumulation order when the record contains the necessary data needed for reformation. *Banks v. State*, 708 S.W.2d 460, 462 (Tex. Crim. App. 1986); *Revels v. State*, 334 S.W.3d 46, 56 (Tex. App.—Dallas 2008, no pet.). Because this record contains sufficient data to allow for reformation of the trial court's cumulation order, we modify the judgments to state:

Cause Number F21-38021:

The Court ORDERS that the sentence in this conviction shall run consecutively and shall begin before the December 5, 2024 judgment

18

and twenty-year sentence in cause number F21-38022 in the Criminal District Court of Jefferson County involving Indecency with a Child by Sexual Contact, and before the December 5, 2024 judgment and twenty-year sentence in cause number F21-38023 in the Criminal District Court of Jefferson County involving Indecency with a Child by Sexual Contact.

Cause Number F21-38022:

The Court ORDERS that the sentence in this conviction shall run consecutively and shall begin only when the December 5, 2024 judgment and twenty-year sentence in cause number F21-38021 in the Criminal District Court of Jefferson County involving Sexual Assault of a Child has ceased to operate, and before the December 5, 2024 judgment and twenty-year sentence in cause number F21-38023 in the Criminal District Court of Jefferson County involving Indecency with a Child by Sexual Contact.

Cause Number F21-38023:

The Court ORDERS that the sentence in this conviction shall run consecutively and shall begin only when the December 5, 2024 judgment and twenty-year sentence in cause number F21-38021 in the Criminal District Court of Jefferson County involving Sexual Assault of a Child and the December 5, 2024 judgment and twenty-year sentence in cause number F21-38022 in the Criminal District Court of Jefferson County involving Indecency with a Child by Sexual Contact have ceased to operate.

*See Revels*, 334 S.W.3d at 56.

## Conclusion

Having overruled Prado's sole issue on appeal, we affirm the trial court's judgments as modified.

AFFIRMED AS MODIFIED.

KENT CHAMBERS  
Justice

Submitted on August 8, 2025  
Opinion Delivered August 27, 2025  
Do Not Publish

Before Golemon, C.J., Wright and Chambers, JJ.

20